# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**PHILLIP R. SIMMONS,**

        **Plaintiff,**

**-vs-**                                **Case No. 6:08-cv-1407-Orl-DAB**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **affirmed.**

### *I. BACKGROUND*

**A.    Procedural History**

Plaintiff filed for a period of disability, DIB and SSI benefits on October 5 and 18, 2004, respectively, alleging an onset of disability on August 5, 2003, due to pain in head, neck, shoulder, back, knees, face; broken leg, tail bone, toe, bones in face; brain damage; and depression. R. 36, 38,

69, 82, 93, 113, 491. His application was denied initially and upon reconsideration. R. 20. Plaintiff requested a hearing, which was held on July 12, 2007, before Administrative Law Judge John D. Thompson (hereinafter referred to as "ALJ"). R. 466-507. A supplemental hearing was held on April 8, 2008 with testimony from a medical expert and a vocational expert. R. 508-75.

In a decision dated May 1, 2008, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 17-31. Plaintiff timely filed a Request for Review of the ALJ's decision. R. 8-16. The Appeals Council denied Plaintiff's request on June 18, 2006. R. 5-7. Plaintiff filed this action for judicial review on August 15, 2008. Doc. No. 1.

### B. Medical History and Findings Summary

Plaintiff was born on September 16, 1963. R. 469. He completed the tenth grade in high school, and he does not have a high school diploma or a GED, but received training in heavy machinery operation. R. 470. Plaintiff's past relevant work consists entirely of employment involving the operation of heavy machinery. R 473.

Plaintiff's medical history is set forth in detail in the ALJ's decision. By way of summary, Plaintiff complained of pain in head, shoulder, back, knees, affective/mood disorder, broken leg with nerve damage, broken tail bone, broken toe, broken vertebrae in neck, 22 bones broken in face, and brain damage. R. 36, 38, 69, 82, 93, 113, 491. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from a severe combination of impairments: a history of multiple injuries due to several accidents; history of right knee meniscus repair; history of tibia plateau fracture with repair and history of malingering; but Plaintiff did not have an impairment severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 22, 26. The ALJ determined that Plaintiff retained the residual

functional capacity (RFC) to perform light work, with a sit/stand option. R. 26. In making this determination, the ALJ found that Plaintiff's allegations regarding his limitations were not totally credible and he was malingering based on the evidence set forth in the decision. Based upon Plaintiff's RFC, the ALJ determined that he could not perform past relevant work. R. 29. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as ticket taker, cashier II, and information clerk. R. 30. Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 31.

Plaintiff now asserts three points of error. First, he argues that the ALJ erred by finding that his mental impairment was not severe. Second, he claims the ALJ erred by finding he had the RFC to perform light work contrary to treating doctors' statements. Third, Plaintiff contends the ALJ erred by failing to state what weight if any was given to the opinion of an examining physician regarding Plaintiff's concentration and short-term memory impairments. Because the first and third issues deal with Plaintiff's alleged mental impairments, the Court analyzes these issues collectively. For the reasons that follow, the decision of the Commissioner is **AFFIRMED**.

## II. STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C.

§ 405(g). Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, he is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent his from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity, age, education, and past work)

prevent his from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

## *III. ISSUES AND ANALYSIS*

**Mental impairment and evaluations**

Plaintiff argues that ALJ applied the wrong standard and erred in finding Plaintiff's mental impairment not severe. The Commissioner responds that the ALJ adequately considered Plaintiff's depression at Step Two of the sequential evaluation.

At Step 2 of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe. By definition, this inquiry is a "threshold" inquiry. It allows only claims based on the most trivial impairments to be rejected. In this Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. A claimant need show only that his impairment is not so slight and its effect not so minimal. *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

The ALJ found that Plaintiff's "medically determinable impairment of mild depressive disorder does not cause more than minimal limitation on the claimant's ability to perform basic mental work activities and is therefore non-severe." R. 25. The ALJ found that Plaintiff's medically determinable impairment was not severe where it caused no more than "mild" limitation in any of the first three functional areas of (1) activities of daily living; (2) social functioning; (3) concentration, persistence and pace; and (4) "no" limitation or no episodes of decomposition. R. 25. Plaintiff argues that the ALJ should not have applied the "paragraph B" criteria of 12.00C and failed to cite any

-5-

evidence in the record in determining that Plaintiff's limitations in the first three areas were mild, and that there were no episodes of decomposition. Doc. No. 15 at 12.

Plaintiff argues that, while these criteria are applicable to deciding the degree of severity in determining residual functional capacity, they do not apply to the threshold standard at Step Two. Instead, at Step Two (Plaintiff argues), the ALJ must consider whether the impairment significantly limits the basic work activities set forth in 20 C.F.R. §§ 404.1521 and 416.921, and he argues there is abundant evidence in the record that his depression is "severe." He argues that Drs. Clements and Hansen diagnosed him with "major depressive disorder" and assigned moderate limitations in understanding and remembering simple instructions and the ability to make judgments on simple work-related decisions, which the ALJ should have credited. Plaintiff argues that by applying the "paragraph B" criteria at Step Two, the ALJ applied an "arguably more stringent standard."

Plaintiff's argument is somewhat beside the point. As the Commissioner argues, even though the ALJ found Plaintiff's depression not severe, since he proceeded with the sequential evaluation past the second step of the sequential evaluation, and went on to consider any work-related restrictions that Plaintiff might have as a result of mental impairments, there is no error.

Plaintiff also argues that the ALJ erred in finding that he suffered from mild depressive disorder (R 25) because there was no such diagnoses in the record, only diagnosis for "depressive disorder NOS" and "major depressive disorder." The Commissioner argues that the ALJ appropriately described Plaintiff's mental impairment as a mild depressive disorder which caused no more than "minimal limitation in claimant's ability to perform basic mental work activities." R. 25. The Commissioner contends that the ALJ provided sound reasons for his finding grounded in the medical and other evidence (R. 28-29), which he fully discussed in his RFC assessment.

After summarizing the lengthy medical evidence (R. 22-25), the ALJ analyzed Plaintiff's mental impairment, finding:

> The claimant's medically determinable mental impairment of mild depressive disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe. In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. These four broad functional areas are known as the "paragraph B" criteria.
>
> The first functional area is activities of daily living. In this area, the claimant has mild limitation. The next functional area is social functioning. In this area, the claimant has mild limitation. The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation.
>
> Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, it is non-severe.
>
> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Accordingly, the undersigned has translated the above "B" criteria findings into work-related functions in the residual functional capacity assessment below.

R. 25-26 (internal citations to SSR omitted).

The ALJ went on to consider the medical evidence (R. 28-29) in determining Plaintiff's work-related restrictions, including those from depression, pertinent to his RFC:

> Little weight was given the claimant's allegations of depression. Treatment notes from Dr. Rivera do not support the claimant's allegations of a debilitating mental impairment and show little treatment for this condition. He has a history of being diagnosed with depression and anxiety. By October 2005, Dr. Rivera indicated that the claimant's depression was improving. The claimant underwent extensive testing

-7-

related to his mental health functioning. Testing done by Drs. Graham and Clements together with the testimony of Dr. Kronberger indicated that the claimant demonstrated strong evidence of malingering. The undersigned does not believe that the claimant had memory loss or cognitive impairment as indicated by Dr. Joseph. The claimant was not noted to have any skull fractures at the time of his accidents. Diagnostic tests did not show a significant neurological injury which one would expect to produce such neuropsychological impairment. The claimant's activities of daily living which include driving and watching many hours of television also do not support the sort of cognitive impairment the claimant alleges. The claimant indicated that he stays at home most days and watches television 8-10 hours a day. Such a level of activity shows a level of persistence and concentration which is not consistent with a complete inability to work or a debilitating head injury. Dr. Kronberger indicated that if the results of the claimant's testing were accurate, he would be severely limited to the extent that he would not even be able to drive a motor vehicle. The undersigned and the claimant's legal representative questioned Dr. Kronberger quite extensively during the hearing regarding the psychometric testing completed by Drs. Graham and Clements [and Hanson] and this expert witness never waivered on his assertion that this claimant was malingering.

The undersigned gave the testimony of Dr. Kronberger greater weight as it corresponds to the totality of the relevant psychological evidence and Dr. Kronberger gave a fairly extensive recitation of the rationale which led him to conclude that this claimant did not experience any significant memory or other cognitive impairment. He noted specifically that the claimant did not have an impairment that met a listing. He also noted that the testing done by Dr. Clements did not correspond to prior neurological testing done of the claimant. Dr. Kronberger found that earlier tests did not show a significant head injury that would cause a cognitive impairment. He also indicated that several tests established that the claimant has a history of malingering. As such, little weight was given Dr. Clements assessment of the claimant. She indicated that the claimant had moderate limitations in his ability to understand, remember and carry out instructions. This assessment is not consistent with the claimant's treatment records and seems to give significant weight to the claimant's subjective complaints.

R. 28-29.

The ALJ first cited the treatment notes of Plaintiff's long-term treating psychiatrist, Edmundo Rivera, M.D., who treated Plaintiff from October 1999 through February 2006 for depression and anxiety, initially related to Plaintiff's divorce. R. 332-48; 347. Dr. Rivera treated Plaintiff with medication, and Plaintiff experienced improved mood and stability through October of 2003. R. 342.

Dr. Rivera's notes post-2003 reflect symptoms of depression and anxiety. R. 332-342. Dr. Rivera's notes reflect that Plaintiff "has not had any drinks in 4 months" and Plaintiff's report: "I was in the hospital for two weeks I was bitten by Piney Rattler[1]." R. 340. They discussed a comment made by Plaintiff's mother who though he was using cocaine, but he denied it. R. 340. He first revealed to Dr. Rivera on June 11, 2004 that "he has had a history of paranoia, which he had not revealed before." R. 339. On September 13, 2004, Plaintiff told Dr. Rivera: "I am totally clean now, I am not [doing] drugs anymore." R. 338. October 21, 2004, he was "off the medicine." R. 337. He reported being abstinent from drugs– he was "done with drugs." R. 337.

The ALJ specifically described Dr. Rivera's treatment of Plaintiff as "little treatment"; and noted that by October 2005, Plaintiff's depression was improving. R. 28, 335. In October 2005, sixteen months after Plaintiff's horse riding accident in June 2004, Dr. Rivera noted without any specification that Plaintiff was improving overall, depression secondary to physical impairment and for the first time: "memory difficulty." R. 334. Plaintiff reported to Dr. Rivera that his recent memory was impaired and his immediate memory was fair. R. 333. Dr. Rivera apparently did not actually test Plaintiff's memory, but based on Plaintiff's reported symptoms, prescribed Aricept for the "memory dysfunction." R. 333. Plaintiff reported in February 2006 that the Aricept "was helping." R. 332. There were no more recent records from Dr. Rivera in the record.

Plaintiff claims that the ALJ should not have discounted the opinion of Plaintiff's treating physician, Dr. Joseph. The ALJ gave "little weight" to the opinion of Dr. Joseph that Plaintiff was disabled and could not work because Dr. Joseph's assessment was not consistent with his treatment notes. R. 29. The letter opining that Plaintiff was disabled is all of one paragraph:

---

[1] The Court could find no other reference to a snake bite in the record, or testimony of it by Plaintiff.

> This letter is to certify that Mr. Simmons is under my care. Mr. Simmons suffered head injury on 6/24/04 resulting in memory loss, loss of concentration, post traumatic headache and multiple facial fractures. Due to this patient's condition it is my opinion that he is disabled and cannot work.

R. 423. The ALJ did not believe that the claimant had memory loss or cognitive impairment as indicated by Dr. Joseph where the CT scan was normal and Dr. Joseph did not give any explanation for finding that Plaintiff was disabled, and he noted shortly after the alleged onset date that attention span and concentration were normal. R. 29. The ALJ's decision to give little weight to Dr. Joseph's opinion, and more weight to the opinion of psychologists regarding Plaintiff's memory and concentration, was based on substantial evidence from the psychological testing and interpretation by the psychologists.

In reaching the conclusion that Plaintiff was malingering, the ALJ also relied on the consultative examinations and testing done by Drs. Graham and Clements, and the testimony of Dr. Kronberger, which indicated that the claimant demonstrated "strong evidence of malingering." R. 28. On September 28, 2005, Malcolm Graham, III, Ph.D., a clinical psychologist, performed a consultative examination of Plaintiff. R. 298-99. Plaintiff argues that the utility of Dr. Graham's testing is limited because he did not perform a mental status evaluation and only administered the Wechsler Memory Scale III.

Because Plaintiff scored as low as possible – less than one percentile – on every area of the Wechsler Memory Scale III, Dr. Graham opined that the scores did not represent an accurate measure of Plaintiff's actual memory functioning. R. 298-99. Dr. Graham opined that a person with such exceedingly low scores in every area would more than likely resemble someone with a progressive neurological disease in the latter stages or someone with a severe head injury, and since Plaintiff's records showed that Plaintiff had only suffered a concussion without any indication of a skull fracture

or other complicating neurological difficulties, Dr. Graham concluded that "the possibility of malingering appears to be fairly strong." R. 298-99.

Following Plaintiff's initial hearing in July 2007, and after an extended colloquy with Plaintiff's counsel on the record who asked for a further consultative examination by a neuropsychologist in light of Dr. Graham's report, the ALJ ordered a second consultative examination by a psychologist and one by a neurologist. On September 18, 2007, Rosimeri Clements, Psy.D. and Christina Hansen Psy.D., a post-doctoral resident under Dr. Clements' supervision, performed a general clinical evaluation with mental status, general intellectual evaluation, memory test, general personality evaluation, and malingering testing on Plaintiff. R. 425. Plaintiff reported to Drs. Clements and Hanson that he had symptoms of sadness daily, crying once a week, loss of desire to ride horses or dirt bikes, insomnia, feelings of worthlessness, and difficulty concentrating, and "short-term memory problems [which] began in 2004 due to horse accident," paranoia, and hallucinations (visual and audio). R. 425. On mental status examination, Plaintiff demonstrated poor recall of recent and remote events; he described the horse accident as "the nose bone went into his brain" and his "eye was hanging out of his head." R. 426. Plaintiff scored "extremely low" on elements of the Wechsler Adult Intelligence Scale –Third Edition, scoring a full-scale IQ of 57. An IQ below 70 is considered retarded. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV).

Plaintiff also scored "extremely low" on the Wechsler Memory Scale-III, scoring "extremely low" in both immediate and general memory. R. 428-29. The examiners also administered the Minnesota Multiphasic Personality Inventory-II to Plaintiff. R. 429. Although the validity scales were within the normal range overall, Plaintiff scored "high" on one validity scale, which indicated he was exaggerating his symptoms – Drs. Clements and Hanson interpreted this "high" score in their

estimation as "a cry for help." R. 430. Plaintiff's scores on the clinical scales were also elevated – again, Drs. Clements and Hanson opined these elevated scores coincided with a "cry for help." R. 430. However, in the Prognosis & Recommendations Section of their CE Report, Drs. Hanson and Clements gave a fuller explanation that was more critical of Plaintiff's performance on the testing:

> His prognosis is guarded due to depression and medical problems. It appears the claimant is very overwhelmed and is crying for help. This is likely why his intellectual functioning and memory scores are in the extremely low range, which does not coincide with talking to him. Someone with this level of impairment would have severe head trauma (more severe than he described) and not be able to hold a conversation or even recall information from a few minutes ago, which the claimant was able to do. The TOMM and MMPI-2 also demonstrate that the claimant was probably exaggerating his symptoms. He has made other attempts to obtain disability in the past and reported throughout the session that he is very worried about finances. Furthermore, three were discrepancies in his statements. He reported on the form that he was not driving, however when asked, he reported driving to doctor's appointments that he knows how to get to quite well. He should not be able to remember the directions, given his WMS-II scores. In the waiting room he asked his mother his birthday (which was 2 days before this appointment) and 30 minutes later he was able to recall it for the examiner. It is likely that he may have memory impairment, given the trauma he reportedly incurred, however, it is not diagnosable at this time, due to his over-representation of problems.
>
> It is likely that the claimant does have impairments due to depression and anxiety, as well as medical problems, however, it is difficult to ascertain at this time, how severe these problems are because of his psychological turmoil and strong cry for help. He also has previous diagnoses of both depression and anxiety. During the evaluation, sadness, withdrawal, irritability, nervousness, difficulty with concentration, difficulty with attention and difficulty focusing were noted. His over-representation of mental health problems solidifies that he should have mental health treatment as this person feels considerably overwhelmed with his needs and therefore is unable to focus on the things such as testing and working at this time.

R. 430.

One reason for the consultative examiners' uncertainty in diagnosing Plaintiff's psychological problems is his complete lack of candor with them about his past cocaine abuse; such references, documented very clearly in other medical records are completely omitted from their CE Report. The

-12-

only references in their CE Report is that Plaintiff "reported no use of alcohol or illicit drugs currently." R. 428. He apparently only reported to them that he that sporadically drank two to three beers two weekends a month in the past – despite two previous DUIs – and had stopped drinking seven years ago. R. 426, 428. He failed to reported that he had previous abuse of street drugs, and Dr. Hanson was obviously not informed from other medical records of Plaintiff's narcotic seeking behavior noted by other physicians. *See* R. 228 (surgery cancelled after patient admitted to smoking crack cocaine the night before); 233 ("It has come to light that the patient has a problem with drug addiction and has been on cocaine and marijuana in the past. He has a tendency to abuse medications."); 281 (has sequentially asked over many, many series of days for a significant amount of pain medications); 282 (appears to be seeking more pain medication); 283 (patient needs to quell his use of narcotic medications); 332 (clean and sober for 2 years).

Plaintiff's reliance on Drs. Clements' and Hansen's diagnosis of Plaintiff with "major depressive disorder NOS" – as opposed to *mild* depressive disorder – mischaracterizes their diagnosis, which was actually "per history" as reported to them by Plaintiff. As set forth above, the extent of Plaintiff's conditions were "not diagnosable at this time, due to his over-representation of problems." R. 430. The same validity problems existed with Drs. Clements' and Hansen's assignment to Plaintiff of a Global Assessment of Functioning Score of 53 (R. 431) and the restrictions on their Medical Source Statement of Ability To Do Work-Related Activities.[2] R. 432-33.

---

[2]They opined that Plaintiff was moderately restricted in: understanding and remembering simple and complex instructions; the ability to make judgments on simple work-related decisions; and the ability to make judgments on complex work-related decisions, with mild restrictions in: carrying out simple instructions; interacting appropriately with the public; interacting appropriately with supervisors; and responding appropriately to usual work situations and changes in routine work setting. R. 432-33.

In an effort to accommodate the request of Plaintiff's counsel at the July 18, 2007 hearing, the ALJ also ordered a consultative examination of Plaintiff by a neurologist, Dr. Bruce R. Hoffen. R. 436. On October 16, 2007, Plaintiff reported to Dr. Hoffen that he was having difficulty with memory and concentration and carrying out tasks, and he had depression for which he was taking medication. R. 436. On examination, Plaintiff recalled two of three items at one and three minutes; Dr. Hoffen opined that Plaintiff's knowledge of current events was mildly impaired, and long term memory was intact. R. 436. Plaintiff used a cane to ambulate, but he was able to walk greater than twenty-five feet without the cane. R. 437. Dr. Hoffen's impressions were head injury with posttraumatic encephalopathy; posttraumatic headaches; and right leg pain with a history of right tibia fracture and partial right peroneal palsy. R. 437. Dr. Hoffen opined that Plaintiff had cognitive difficulties due to a head injury in June 2004. R. 437. In addition, he opined, there is a mood disturbance for which he is taking Remeron; he has chronic head aches and requires daily Percocet and Oxycodon, and chronic pain syndrome associated with the right knee trauma. R. 437.

As to Plaintiff's functional capacity, Dr. Hoffen found that Plaintiff required the use of a cane for distances greater than fifty feet. R. 437. He also found that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, could stand or walk for at least two hours in an eight hour day, and could sit for up to six hours per day, avoiding bending, stooping, crouching, climbing, kneeling, balancing, crawling, all unprotected heights, and extremes of temperature, noise or fumes. R. 437. Dr. Hoffen opined that Plaintiff would have trouble seeing small print clearly, but he was capable of following commands well, but there is impairment of concentration and short-term memory making it difficult for him to carry out complex tasks. R. 437.

As Carlos Kronberger, Ph.D., a Diplomate of the American Board of Professional Psychologists, and a board certified clinical psychologist, who testified as medical expert, opined that the narrative of Drs. Clements and Hanson showed, in his opinion, "clear cut evidence of malingering," and they should not have offered the interpretation of major depressive disorder because it was inappropriate:

> [T]he more recent evaluation was another CE evaluation by a post doctorate or resident . . . [with] Dr. Rosemary Clements . . . the supervising psychologist. Christina Hanson actually carried out the evaluation, and in the narrative she indicates that there is clear cut evidence of malingering, but then it goes ahead and gives a diagnosis based on prior assessments that she had found of major depressive disorder and all ads which is actually incorrect because the number of 311 does not correspond to major depression. It corresponds to depressive disorder not otherwise specified. So that's not correct. And then the second diagnosis on page 7, and this is Exhibit 26, is anxiety disorder not otherwise specified again by history, and then it is placed on Axis II, which is incorrect. It should be on Axis I rule out cognitive disorder not otherwise specified. The MMPI which was administered was found to be invalid. it is not specified which scale was invalid. I suspect it was probably the F scale but, nonetheless, there was an interpretation made or offered which is really not appropriate.
> * * *
> [T]here are two sets of scores reported, one for the Wexler Adult Intelligence Scale, Third Edition, which yielded a full IQ score of 57, and both verbal and performance scales were found to be extremely low. There is no comment made about the validity of those scores, and there is no history of developmental delays before age 22, and memory testing was completed with the Wexler Memory Scale, Third Edition, which yielded very low, extremely low scores in general memory, and immediate memory. And, again, there is no comment made about how there types of scores would have to be correlated with some non-neurological insult to the brain, and that even would make sense with the neurological reports. Now there is a neurological report [by] . . . Dr. Burce Hoffen, and there is a part of the physical examination at the bottom on page 1 indicating that the patient was oriented times three, and before that the patient was alert and in no apparent distress oriented times three. His knowledge of current events is mildly impaired. The long term memory is intact. Speech is fluent with good comprehension mainly repetition reading and writing. All of this would contradict the entire contents of the report by doctor, the psychological evaluation by Dr. Hanson. So that is the gist – of both of those tests that were administered for the CE evaluation of September 18, 2007 by Dr. Hanson were all invalid. All those test scores are invalid, and no inferences can be made, or should be made based on those test scores.

R. 517-19. The ALJ asked Dr. Kronberger if an alternative interpretation could have been reached, which would have been more consistent, *i.e.*, that the person was malingering as opposed to a cry for help, given the prior performance on the testing done by Dr. Graham. Dr. Kronberger responded:

> Right. That's why I said those types of interpretations [or] narrative comments that were made are not, they are not considered to be valid. They are not appropriate because Dr. Hanson did something a little bit more than Dr. Graham. She, in fact, added the test for memory and malingering which is on [the CE] report.

R. 520. The ALJ commented that he had specifically requested for that particular test – the Test of Memory for Malingering ("TOMM") – to be administered in light of Dr. Graham's earlier findings. R. 520. The TOMM test, according to Dr. Kronberger, is "the right measure to answer the question of whether the scores are reasonable to expect [from] somebody who fell off a horse and hit his head, and has been complaining from that point on although not consistently." R. 520. He explained further that the TOMM answers whether the person being tested is malingering:

> The [TOMM[ is specifically designed for people who have known head injuries and so forth, and very touch and go neurological diseases. But they tend not to do poorly on this test. So the only people who do poorly on this test are the ones who are malingering. . . [It] is designed with a sample of people with known neurological cognitive disorders. So they have people with dementia. They have people with various types of [] head injuries, strokes, etc. They are a part of the standardization sample, the norming sample. So they are shown these pictures, and their scores are compared against people who don't have these types of deficits, but have an interest in portraying themselves as if they did, and they are the ones that will have an extraordinary number of errors. . . . [I]t is structured specifically to test that one question – whether a person has actual neuro cognitive deficits or not – and the answer came up that he does not but yet he wants to appear as if he does. So he failed that test and, unfortunately, Dr. Hanson doesn't really emphasize that point sufficiently, and still fills in a statement that some of this could be interpreted as psychological turmoil, and a strong cry for help. But there is a general agreement, particularly if we are doing an assessment in a forensic setting which this is, where there is an ulterior motive for promotion or showing impairment that these test scores cannot be trusted. You can't just take whatever parts you think are still whole out of the MMPI if the validity scales are in question, or if you have an additional test such as the TOMM that showed there was definite malingering. So here you have two confirming pieces of data suggesting that the individual at that time was malingering.

-16-

R. 521-22. When asked about the inconsistency of the psychological/psychometric testing compared to Dr. Hoffen's neurological exam, Dr. Kronberger gave the example that someone with such a low IQ as attributed to Plaintiff, or such extreme deficits in memory, would not be able to drive a car, which is considered a pretty complex task. R. 522-23. Yet, Dr. Hanson noted that Plaintiff admitted he did drive a car, contrary to his initial answer on a form that he did not drive. *See* R. 427. He also testified at the hearing that he drives.

Dr. Kronberger opined that Plaintiff had depressive disorder not otherwise specified, and anxiety disorder not otherwise specified. R. 523. He would have mild limitations in: understanding and remembering simple instructions, carrying out simple instructions, and moderate limitations in his ability to maintain judgments on simple work-related decisions; with all other limitations being mild "across the board." R. 523-24.

Plaintiff argues that the ALJ erred because he did not comment on Dr. Hoffen's statement that Plaintiff had an impairment of concentration and short-term memory making which limited his ability to carry out complex tasks. R. 437. Dr. Hoffen's neurological consultative examination was ordered by the ALJ in the context of determining if Plaintiff had genuine concentration or memory problems or was malingering, as he agreed to do at the end of the July 18, 2007 hearing. Dr. Hoffen's opinion appears based on Plaintiff's reported "indicat[ion] he has difficulty with concentration and carrying out tasks"; and [that he] experiences diffuse throbbing, aching headaches daily for which he is taking Percocet." R. 436. The testimony of Dr. Kronberger, on which the ALJ heavily relied, very specifically refuted the opinion of Dr. Hoffen's memory and concentration findings, which were apparently based heavily on Plaintiff's report of his condition and symptoms, as opposed to the objective TOMM testing performed by Drs. Clements and Hanson.

The ALJ properly relied on Dr. Kronberger's very detailed analysis of Plaintiff's psychological and psychometric testing: "The undersigned and the claimant's legal representative questioned Dr. Kronberger quite extensively during the hearing regarding the psychometric testing completed by Dr. Graham and Clements and this expert witness never waivered in his assertion that this claimant was malingering." R. 28. Accordingly, the ALJ's decision was based on substantial evidence.

### *IV. CONCLUSION*

The ALJ appropriately considered the circumstances of Plaintiff's conditions and analyzed them in relation to the exacting disability standard under the Social Security Act. For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence. Accordingly, the Court **AFFIRMS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 14, 2009.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record